THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SIERRA CLUB, a California nonprofit
corporation, et al.,

                            Plaintiffs,

            v.

BNSF RAILWAY COMPANY, a
Delaware corporation,

                            Defendant.

CASE NO. C13-967-JCC

ORDER DENYING PLAINTIFFS'
AND DEFENDANT'S MOTIONS
FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiffs' motion for partial summary judgment
(Dkt. No. 197) and Defendant's motion for summary judgment (Dkt. No. 200). Having
thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument
unnecessary and hereby DENIES the motions for the reasons explained herein.

# I.    BACKGROUND

The above-captioned matter is a Clean Water Act (CWA) citizen lawsuit in which seven
environmental advocacy organizations allege that BNSF Railway Company—an operator of
railway lines that run from Wyoming to Washington—violates federal law by allowing its
railcars to discharge coal and related pollutants into protected waterways within Washington.
(Dkt. No. 113.) Plaintiffs are Sierra Club, Puget Soundkeeper Alliance, RE Sources for
Sustainable Communities (RE Sources), Columbia Riverkeeper, Friends of the Columbia Gorge,

Inc., Spokane Riverkeeper, and Natural Resources Defense Council (NRDC). (*Id.*) Plaintiffs allege that each organization has members who "live, work, and recreate in the State of Washington." (*Id.* at ¶ 12.) They seek declaratory and injunctive relief against BNSF under the CWA for the allegedly unpermitted discharges, as well as "remedial relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees." (*Id.* at ¶ 6.)

Plaintiffs base Defendant's CWA violations on the alleged fact that "[e]ach and every train and each and every rail car discharges coal pollutants to waters of the United States when traveling adjacent to, over, and in proximity to the waters of the United States." (*Id.* at ¶ 48.) Plaintiffs allege that each time a BNSF train carrying coal travels through the state of Washington it discharges coal pollutants "through holes in the bottoms and sides of the rail cars and by spillage or ejection from the open tops of the rail cars and trains." (*Id.* at ¶ 51.) Such discharges are alleged to be

> [E]specially frequent or severe when the[] coal trains pass over rough rail tracks, track changes, bridges, and switches; during transportation of coal over bumpy terrain, in windy conditions, at high operating speed, during steep descents and ascents and through sag-areas spanning steep ascent and descent reaches of track[]; during and after precipitation events; at moments of high crosswinds; and during derailments.

(*Id.* at ¶ 53.) Because BNSF has "never obtained a NPDES [National Pollution Discharge Elimination System] permit allowing its discharges of coal pollutants . . . from rail cars and trains[,]" Plaintiffs allege that each discharge constitutes an unpermitted and unlawful discharge under the CWA. (*Id.* at ¶ 60.)

On August 19, 2016, both parties moved for summary judgment. (Dkt. Nos. 197, 200.) Both parties raise three issues in their briefing: Article III standing, liability for alleged CWA violations, and preemption of CWA remedies by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101 *et seq.*, (ICCTA).[1]

---

[1] As a legal matter, whether one federal statute prevents application of another is a question of preclusion, not preemption. *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014). However, to remain

ORDER DENYING PLAINTIFFS' AND
DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT

## II.     DISCUSSION

### A.     Motion for Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn there from in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The parties agree that the evidentiary standard in this case, preponderance of evidence, can be met by circumstantial evidence. (Dkt. No. 293 at 5) (citing *In re Exxon Valdez*, 270 F.3d 1215, 1232 (9th Cir. 2001)). However, "at this stage of the litigation, the judge does not weigh conflicting evidence with respect to a disputed material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Anderson*, 477 U.S. at 249).

Where parties have filed cross-motions for summary judgment, "[e]ach motion must be

---

consistent with the ICCTA's statutory language, the Court will use the term "preemption" when discussing this preclusion issue.

ORDER DENYING PLAINTIFFS' AND
DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT
PAGE - 3

considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1135–36 (9th Cir. 2001). However, in this case, the arguments set forth in the parties' summary judgment motions are the same as those set forth in their oppositions to the opposing parties' summary judgment motion. The Court will therefore address the motions together.

## B.   Article III Standing

Standing, which is an "essential and unchanging" requirement of federal jurisdiction, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), requires that parties have "a personal stake in the outcome of the controversy [so] as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Allen v. Wright*, 468 U.S. 737, 770 (1984). When, as here, an organization seeks to invoke federal jurisdiction, it must prove "(a) its members would have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). At issue in these motions is whether a member of one of the Plaintiff organizations would otherwise have standing to sue in his or her own right.

To maintain an action in federal court, a member of one of the Plaintiff organizations must show: (1) the member has suffered or will suffer a concrete and particularized "injury in fact," (2) the injury is fairly traceable to the conduct complained of; and (3) the injury is likely redressable by a favorable decision. *Defs. of Wildlife*, 504 U.S. at 560–61. The CWA's citizen suit provision "extends standing to the outer boundaries" set by Article III of the Constitution. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (citing *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16 (1981)). "In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ.

1  Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Defs.*

2  *of Wildlife*, 504 U.S. at 561.

3      Defendant attacks Plaintiffs' standing on many fronts and this standing analysis has many

4  moving pieces. First, the Court will discuss Plaintiffs' argument that only one plaintiff needs

5  standing for the case to proceed. (Dkt. No. 267 at 11.) The law is clear that "only one [p]etitioner

6  must establish standing to enable review." *Sierra Club v. U.S. EPA*, 762 F.3d 971, 976 (9th Cir.

7  2014) (citing *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). Defendant concedes that

8  Plaintiffs Sierra Club, Columbia Riverkeeper, Puget Soundkeeper Alliance, and NDRC may

9  have standing for Colony Creek, Horsethief Lake, Klickitat River, Little White Salmon River

10  (Drano Lake), White Salmon River, and Wind River. (Dkt. No. 293 at 2 n.1.)[2] However, the fact

11  that four plaintiffs may have standing for six waterways does not necessarily mean that the

12  Plaintiffs have standing for all of the waterways in Washington that BNSF trains pass.

13      Therefore, the Court next addresses Defendant's argument that Plaintiffs do not have

14  standing because they "cannot use a limited number of waterbodies in a representative capacity

15  to establish standing for all waterbodies in the state" because each discharge into each waterbody

16  constitutes a separate violation of the CWA. (Dkt. No. 200 at 14.) Defendant made the same

17  argument in a motion to dismiss over two years ago (Dkt. No. 66 at 7), which the Court denied.

18  (Dkt. No. 77.) This Court held that "[s]uch a burden would undoubtedly be a herculean task

19  given the scope of Plaintiffs' allegations." (Dkt. No. 77 at 10.) Plaintiffs do not dispute that they

20  have not provided standing witnesses for each and every waterway identified in this matter. (Dkt.

21  No. 197 at 41.) However, Plaintiffs ask this Court to adopt the holding of *Alaska Center for*

22  *Environment v. Browner*, 20 F.3d 981 (9th Cir. 1994), in order to confer standing for their

23  alleged CWA violations at all the waterways at issue. (Dkt. No. 197 at 43.)

24

25  [2] Defendant's contention in its reply that NDRC may have standing is inconsistent. (Dkt. No. 293 at 2 n.1.)
Defendant argued in its motion for summary judgment that NDRC failed to present any members with standing.

26  (Dkt. No. 200 at 26). However, because at least one Plaintiff, Sierra Club, Columbia Riverkeeper, or Puget Sound
Alliance, may have standing, Defendant's inconsistency does not change the Court's analysis.

ORDER DENYING PLAINTIFFS' AND
DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT
PAGE - 5

In *Alaska Center for Environment*, plaintiffs brought a citizen suit against the Environmental Protection Agency (EPA) to implement the CWA's provisions concerning total maximum daily loads to achieve water quality standards for impaired waterways in Alaska. 20 F.3d at 983. The EPA argued that the lower court erred in ordering statewide relief, and the relief could only be granted for those waterways that the plaintiffs' members had used and for which they therefore had standing for. *Id.* at 985. The Ninth Circuit held that a plaintiff seeking state-wide environmental relief was not required to demonstrate harm over the entire state but was only required to establish that a representative number of areas were adversely affected by the EPA's inaction. *Id.* The Ninth Circuit found that "for CWA regulatory purposes, all waters within a state are interrelated" and focused on the singular nature of the defendant's conduct in relation to all the waterways. *Id.* The Court found that the plaintiff had presented the legal questions at issue in a "concrete factual context" that the Article III standing requirement was meant to ensure. *Id.*

In *Washington Toxic Coalition v. EPA*, 2002 WL 34213031, at *7 (W.D. Wash. July 2, 2002), this Court declined to extend the *Alaska Center for Environment* holding to claims under the Endangered Species Act where the EPA failed to properly consult with another agency regarding the effects of its pesticide registrations. This Court declined because "the actions that plaintiffs challenge [were] not singular, as in *Alaska Ctr.*, but myriad." *Id.* This Court held that "[a]lthough the duty to consult is identical with respect to all registered pesticides, it is distinct with respect to each pesticide," and therefore the case was factually distinct from *Alaska Center for Environment*. *Id.* In comparison, this Court has already held that although Plaintiffs in this case allege multiple continuing violations of the CWA, they assert one central claim: "Defendant's operation of train cars, which because of their design and use routinely discharge the same coal pollutants, systematically and continually violates the CWA prohibition of unauthorized discharges." (Dkt. No. 77 at 11.) Therefore this Court's analysis in *Washington Toxic Coalition* is not binding because although Plaintiffs allege separate violations of the CWA

at each waterway, the conduct is not distinct and different with regards to each waterway.

Moreover, the Court is not persuaded by Defendant's claim that *Alaska Center for the Environment* does not apply because this matter does not involve a challenge to a state-wide government action. (Dkt. No. 272 at 43.) The Ninth Circuit in *Alaska Center for the Environment* did not base its standing holding on the fact that the plaintiffs were suing the EPA or a unit of the government. The holding was based on the fact that the EPA's failure to implement CWA provisions would be felt across every waterway within the state. The same occurs here: Plaintiffs allege that coal discharges affect every Washington waterway that BNSF's trains travel adjacent to or across. Therefore, the Court adopts the holding in *Alaska Center for the Environment* for this case.

However, although general allegations of harm suffice at the motion to dismiss stage, Plaintiffs must still set forth specific facts to support their standing claims, even under this more lenient *Alaska Center for the Environment* standard for state-wide environmental claims. *See Defs. of Wildlife*, 504 U.S. at 561. Plaintiffs must establish with specific facts that (1) at least one Plaintiff has standing to sue on behalf of its members by meeting the three standing requirements and (2) the specific and representative waterways the Plaintiffs have alleged standing for provide a "concrete factual context" to establish standing for the remaining waterways. *See Alaska Center for the Environment*, 20 F.3d at 985.

### 1. Injury in Fact

"The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place . . . and that that interest is impaired by a defendant's conduct." *Ecological Rights Found.*, 230 F.3d at 1147 (collecting cases). The individual's injury must be actual or threatened, *see United States v. Ensign*, 491 F.3d 1109, 1116–17 (9th Cir. 2007), though it is clear that an actual "increased risk of harm can itself be injury in fact sufficient for standing." *Ecological Rights Found.*, 230 F.3d at 1151. "[T]he threshold question of citizen standing under the CWA is whether an individual can

1    show that she has been injured in her use of a particular area because of concerns about

2    violations of environmental laws, not whether the plaintiff can show there has been actual

3    environmental harm." *Id.* (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,

4    204 F.3d 149, 160 (4th Cir.2000) (en banc)). As the Ninth Circuit has explained, "an individual

5    can establish 'injury in fact' by showing a connection to the area of concern sufficient to make

6    credible the contention that the person's future life will be less enjoyable—that he or she really

7    has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in

8    question remains or becomes environmentally degraded." *Id.* at 1149. The claimed injury "need

9    not be large, an identifiable trifle will suffice." *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546,

10   557 (5th Cir. 1996).

11          For example, in *Friends of the Earth v. Laidlaw*, the Supreme Court held that an

12   environmental organization had standing to bring a CWA citizen suit based on the declarations

13   of its members, in which the individuals alleged that they were injured in their downstream use

14   and enjoyment of a river, because the defendant had repeatedly discharged pollutants directly

15   into the same waterway. *Laidlaw*, 528 U.S. at 181–83. The Court held that the plaintiffs had

16   sufficiently demonstrated injury to their recreational and aesthetic interests by proving that they

17   had repeatedly used and observed the river which was being polluted. *Id.* The Court made clear

18   that the path from the pollution to the harm upon which the individuals' injuries were based was

19   readily apparent, and explained that the plaintiffs' concerns were "reasonable." *Id.* Importantly,

20   the Supreme Court noted that it saw "nothing 'improbable' about the proposition that a

21   company's continuous and pervasive discharges of pollutants into a river would cause nearby

22   residents to curtail their recreational use of that waterway and would subject them to other

23   economic and aesthetic harms."*Id.* at 184.

24          Here, Plaintiffs have provided an appendix to their motion for partial summary judgment

25   outlining which members of Plaintiffs' groups have standing at 30 different waterways in the

26   state of Washington. (Dkt. No. 197 at 49–51.) Plaintiffs allege that these members and their

1   injuries at these 30 waterways are representative for the remaining, unsupported waterways.

2   (*Id.* at 41.)The waterways identified with standing witnesses include the Columbia River and

3   Puget Sound, two of the largest waterways in the state of Washington. (*Id.*) The appendix is

4   supported by 20 declarations from members of Plaintiffs' groups. (Dkt. Nos. 46–65.) Defendant

5   argues that these declarations contain merely "conclusory allegations of harm" that were

6   "manufactured for purposes of this litigation." (Dkt. No. 200 at 19–20.) Defendant further

7   contends that even "where Plaintiffs' members claim to have observed coal they have not shown

8   any actual, concrete injury" because "alleging discharge, without more, does not establish

9   injury." (*Id.* at 21.)

10      However, Plaintiffs' members have stated that they have seen coal in the water and have

11  been reluctant to continue use of waterways. For example, Sierra Club member Kathleen

12  Seabrook states that she enjoys windsurfing at a spot on the Columbia River known as Doug's

13  Beach. (Dkt. No. 49 at ¶ 6.) She alleges that "even after a few hours of windsurfing at Doug's

14  Beach," her car will be covered in a fine layer of what she believes to be coal dust. (*Id.* at ¶ 9.)

15  She also claims that in the summer of 2012 near Doug's Beach, she "observed a coal train

16  moving slowly nearby and saw piles of coal left on the tracks in its wake that [she believes] came

17  off the tops and out of the bottom of the cars and went into the river as well." (*Id.* at ¶ 14.) As a

18  result of the coal discharges, she is reluctant to continue windsurfing in the Columbia River. (*Id.*

19  at ¶ 15.) This is exactly the type of injury sufficient to confer standing based on specific facts

20  because Ms. Seabrook has shown a connection to the area of concern, her wind surfing at the

21  Columbia River, sufficient to make credible the contention that her future life will be less

22  enjoyable, because she is reluctant to return. *See Ecological Rights Foundation*, 230 F.3d at

23  1148–49. There is "nothing 'improbable' about the proposition that a company's continuous and

24  pervasive discharges of pollutants into a river would cause nearby residents to curtail their

25  recreational use of that waterway and would subject them to other economic and aesthetic

26  harms." *Laidlaw*, 528 U.S. at 184.

1    Plaintiffs' declarations are replete with similar facts at different waterways. (*See, e.g.*,

2    Dkt. No. 51 at ¶ 8–9 (Puget Sound Alliance member saw coal in the water near the Ballard locks

3    and in the Puget Sound, and her enjoyment there was diminished); Dkt. No. 54 at ¶ 21

4    (Columbia Riverkeeper member saw coal in the Columbia River, and his enjoyment there was

5    diminished)). Moreover, although not all Plaintiffs' members allege that they have seen coal in

6    the waterways, all at least allege they have seen BNSF trains near the waterways or coal near the

7    tracks, and their enjoyment of the waters are limited by the alleged CWA violations. (*See e.g.*,

8    Dkt. No. 46 at ¶ 7.) Therefore, Defendant's contention that some of Plaintiffs' members do not

9    allege injury because they did not witness actual coal in the waters is incorrect. Plaintiffs have

10   done exactly what they are required to do to prove standing: prove they have been injured in

11   their use of a particular area because of concerns about violations of environmental laws.

12   *Ecological Rights Found.*, 230 F.3d at 1151. Proof of actual environmental harm is not

13   necessary. *Id.*

14        Moreover, Defendant's allegation that Plaintiffs cannot prove injury in fact because not

15   all of Plaintiffs' members have discontinued use of the waterways is off base. Cessation of use is

16   not a prerequisite for an injury to confer standing. Plaintiffs merely need to show that their

17   "pleasure is diminished." *Am. Bottom Conservancy v. U.S. Army Corp. of Eng'rs*, 650 F. 3d 652,

18   658 (7th Cir. 2011). As already indicated above, Plaintiffs have met this burden. Therefore,

19   Plaintiffs have alleged sufficient facts to prove they suffered injury due to Defendant's alleged

20   pollution of Washington waterways.

21        2.   Causation

22        Second, Plaintiffs' injury in fact must be "fairly traceable" to the challenged activity.

23   *Defenders of Wildlife*, 504 U.S. at 560–61. The Ninth Circuit has adopted the holding of the

24   Fourth Circuit in *Gaston Copper* that the threshold requirement of "traceability does not mean

25   that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise

26   harm suffered by the plaintiffs" in order to establish causation. *Nat. Res. Def. Council v. Sw.*

ORDER DENYING PLAINTIFFS' AND
DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT
PAGE - 10

*Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000) (quoting *Gaston Copper Recycling Corp.*, 204 F.3d at 161) (citations and internal quotation marks omitted). Proving causation with a scientific certainty goes to the merits of the case. *Ecological Rights Foundation*, 230 F.3d at 1152. To satisfy the standing causation requirement, "[r]ather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." *Nat. Res. Def. Council*, 236 F.3d at 995. Therefore, Plaintiffs may rely on "circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability." *Gaston Copper Recycling Corp.*, 204 F.3d at 163.

Defendant argues that causation is not met because "water does not flow upstream" and "Plaintiffs lack evidence of a geographic connection between a distant alleged discharge and areas that their members actually use." (Dkt. No. 200 at 22–25.) Essentially, Defendant contends that causation cannot be established for all the waterways at issue. (Dkt. No. 272 at 47.) Plaintiffs counter that because BNSF is the sole transporter of coal in Washington over and adjacent to the navigable waters at issue, their injuries are traceable to BNSF. (Dkt. No. 217-1 at 5.) Moreover, many Plaintiffs' members have seen BNSF trains passing by the representative waterways. (*See infra* § II.B.1.) The Court agrees with Plaintiffs. Because the Court has adopted *Alaska Center for the Environment*, Plaintiffs need to prove only that their injuries at the allegedly representative waterways were traceable to Defendant, not that Defendant caused an injury at each waterway at issue. Therefore based on the facts stated above, the Court concludes that Plaintiffs have alleged sufficient facts to support causation for their injuries.

### 3. Redressability

The Court need not linger on the redressability prong. Outside of challenging that certain relief is unavailable, an argument the Court addresses below, Defendant does not challenge that Plaintiffs have adequately supported redressability. The Court is likewise satisfied that Plaintiffs' injuries would be redressed by a favorable decision in this matter.

1    Therefore, Plaintiffs have alleged sufficient facts that their members have standing at the

2    representative waterways.[3]

3          4.   Standing for All Waterways

4    Finally, the Plaintiffs must also prove that the specific and representative waterways

5    provide a "concrete factual context" to establish standing for the remaining, unsupported

6    waterways. *See Alaska Ctr. for the Env't*, 20 F.3d at 985. Plaintiffs contend that they have

7    provided standing witnesses for "most of the waters involved in this case" including two main

8    "receiving waters", the Columbia River and Puget Sound. (Dkt. No. 197 at 42.) Therefore,

9    Plaintiffs argue, these supported waterways are representative of all of the other unsupported

10   waterways at issue in this case. (*Id.*) Defendant contends that the waterways cannot be

11   representative because Plaintiffs have not provided any evidence that the unsupported

12   waterbodies are physically connected to the representative and supported waterbodies. (Dkt. No.

13   272 at 47.)  However, the Ninth Circuit has held that "for CWA regulatory purposes, all waters

14   within a state are interrelated." *Alaska Ctr. for Env't*, 20 F.3d at 985. *See Ctr. for Biological*

15   *Diversity v. EPA*, 90 F. Supp. 3d 1177, 1188 (W.D. Wash. 2015) (finding that the alleged harms

16   spanned a sample set of beaches and coastline for Washington's and Oregon's coastlines and

17   estuaries). Moreover, the parties stipulated that "many of the waterways for which Plaintiffs have

18   not identified standing witnesses are tributaries, hydrologically connected waterways, or have a

19   significant nexus with waterways for which Plaintiffs have identified standing witnesses."

20   (Dkt. No. 202-2 at 120.) Therefore, in light of the holding in *Alaska Center for the Environment*

21   that the Court has adopted, Plaintiffs have presented a concrete factual context to establish

22

23   _____

24   [3] Defendant argues that three Plaintiff organizations do not have standing because they have no members. (Dkt. No.
     200 at 15–17.) This argument is irrelevant, however, because Defendant concedes (Dkt. No. 293 at 2 n.1.), and the
     Court agrees, that at least Sierra Club has standing. The law is clear that "only one [p]etitioner must establish

25   standing to enable review." *Sierra Club*, 762 F.3d at 976. Standing is demonstrated by the declaration of Ms.
     Seabrook, a member of Sierra Club, and the fact that the Court finds the representative waterways establish a

26   concrete factual context to maintain standing for the remaining waterways, discussed below. Therefore, the Court
     need not decide if the remaining Plaintiffs have standing.

ORDER DENYING PLAINTIFFS' AND
DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT
PAGE - 12

1    standing for all of the remaining and unsupported waterways in the state of Washington that

2    BNSF trains pass. Plaintiffs have successfully alleged standing for major waterways, including

3    the Columbia River and Puget Sound, and have provided an adequate sample set of waterways.

**C.     Clean Water Act Violations**

4

5    Moving to the merits of the case, Plaintiffs request that the Court find that there is no

6    genuine dispute that Defendant is liable for discharging coal into Washington's waterways in

7    violation of the CWA. (Dkt. No. 197 at 7.) Plaintiffs present the Court with three options:

8    (1) find that BNSF is liable for at least 12,583,440 violations of the CWA in Washington for the

9    period from 2012 through 2015 based on a finding that all rail cars discharge continuously;

10   (2) find that BNSF is liable for at least 15,000 violations of the CWA in Washington based on

11   individual discharge events attested to by Plaintiffs; or (3) grant Plaintiffs' request for

12   declaratory relief that BNSF is liable for CWA violations in Washington, while holding over to

13   trial determination of the total number of CWA violations, the appropriate amount of civil

14   penalties, and Plaintiffs' requests for injunctive and remedial relief. (*Id.* at 46.) Defendant

15   requests that the Court should dismiss the case entirely because there is no dispute that

16   Defendant did not violate the CWA (Dkt. No. 200 at 28–43) and the ICCTA preempts Plaintiffs'

17   requested remedies (Dkt. No. 200 at 43–57). Having thoroughly considered the parties' briefing

18   and the relevant record, the Court finds that none of the requested relief is entirely adequate.

19   The CWA's objective is to "restore and maintain the chemical, physical, and biological

20   integrity of the Nation's water." 33 U.S.C. § 1251(a). The CWA prohibits "discharge" of "any

21   pollutant" from a "point source" into "navigable waters," unless the discharge is authorized by a

22   permit. 33 U.S.C. § 1311(a). To ensure enforcement, Congress included a "citizen suit"

23   provision authorizing any citizen to commence suit against "any person . . . who is alleged to be

24   in violation of . . . an effluent standard or limitation." 33 U.S.C. § 1365(a). An "effluent standard

25   or limitation" includes the prohibition against discharging pollutants from a point source into

26   navigable waters, unless authorized by a permit. 33 U.S.C. § 1365(f)(1).

ORDER DENYING PLAINTIFFS' AND
DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT
PAGE - 13

To establish a violation of section 1311(a), a citizen-plaintiff must establish that the defendant is (1) a person that has (2) discharged (3) a pollutant (4) from a point source (5) into navigable waters (6) without a National Pollution Discharge Elimination System permit. 33 U.S.C. §§ 1311(a), 1342; *ONCR Action v. U.S. Bureau of Recl.*, 798 F.3d 933, 936 (9th Cir. 2015). Liability under the CWA is strict, and there is no "*de minimis*" exception. *Sierra Club v. Union Oil of Cal.*, 813 F.2d 1480, 1490 (9th Cir. 1987), *vacated on other grounds*, 485 U.S. 931 (1988). The parties agree that only the point source discharge element remains in dispute. The Court agrees and need not consider the person, pollutant, navigable waters, or without a permit elements of a CWA claim in this Order. Before the Court can decide if there are disputes of material fact as to CWA liability, the Court must first decide as a matter of law if the Plaintiffs' claims are in fact actionable point source discharges pursuant to the CWA.[4]

### 1. Point Source Discharges

Defendant contends that coal emissions to land, coal emissions from land to water, and coal dust emissions are not point source discharges under the CWA. (Dkt. No. 197 at 28, 35.) Pursuant to the CWA, a "point source" means "*any discernible, confined and discrete conveyance*, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, *container, rolling stock*, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (emphasis added). However, "[o]ther pollution sources, such as runoff from agriculture or . . . animal grazing[ ] are nonpoint sources." *Or. Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1095 (9th Cir. 1998). "Discharge of a pollutant" means "any *addition* of any pollutant *to* navigable waters from any point source." 33 U.S.C. § 1362(12) (emphasis added). Based on the statutory

---

[4] Defendant divides its argument into two distinct sections attacking discharges and point sources separately. (*See* Dkt. No. 200 at 28, 36.) However, because the two are interrelated, the Court considers them together. There is only a CWA violation if there is a point source that discharges as a discrete conveyance. 33 U.S.C. § 1362(14) (defining point source as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged").

ORDER DENYING PLAINTIFFS' AND
DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT
PAGE - 14

1   language, Plaintiffs must do more than point to a statutorily defined point source to prove that

2   there was actual addition of coal to the waters. They must also prove that there was a discharge

3   to navigable waters.

4        The Supreme Court has held that an alleged point source "need only convey the pollutant

5   to 'navigable waters'" for it to be a point source discharge. *S. Florida Water Mgmt. Dist. v.*

6   *Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004). If an alleged emission is not a point

7   source discharge, it is defined as "nonpoint source pollution" by courts. "Although nonpoint

8   source pollution is not statutorily defined, it is widely understood to be the type of pollution that

9   arises from many dispersed activities over large areas, and is not traceable to any single discrete

10  source. Because it arises in such a diffuse way, it is very difficult to regulate through individual

11  permits." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d

12  1181, 1184 (9th Cir. 2002). The Ninth Circuit went on to explain that the most common example

13  of nonpoint source pollution is the residue left on roadways by automobiles due to the rubber

14  worn off of millions of cars, which is then carried away to waterways. *Id.* Although this rubber is

15  inherently a pollutant, this is nonpoint source pollution because there is not a single discrete

16  source. *Id.* Importantly, "point and nonpoint sources are not distinguished by the kind of

17  pollution they create or by the activity causing the pollution, but rather by whether the pollution

18  reaches the water through a confined, discrete conveyance." *Trustees for Alaska v. EPA*, 749

19  F.2d 549, 558 (9th Cir. 1984).

20       While the CWA recognizes that nonpoint source pollution also contributes to the

21  degradation of water quality, it "provides no direct mechanism to control nonpoint source

22  pollution." *ONRC Action*, 798 F.3d at 936 (citing *Dombeck*, 172 F.3d at 1097). Nonpoint source

23  pollution is "generally excluded from CWA regulations" and is left to the states to regulate

24  through their own tracking and targeting methods. *Or. Natural Desert Ass'n v. U.S. Forest Serv.*,

25  550 F.3d 778, 785 (9th Cir. 2008). The reason for this is, in part, because "nationwide uniformity

26  in controlling non-point source pollution [is] virtually impossible" and, in part, because Congress

1   is reluctant "to allow extensive federal intrusion into areas of regulation that might implicate land

2   and water uses in individual states." *Id.*

3                    a.    *Emissions to land and from land to water*

4          Plaintiffs argue that BNSF coal emissions to the land adjacent to the tracks are point

5   source discharges because the BNSF trains are statutorily defined in the CWA as rolling stock

6   and container. (Dkt. No. 197 at 23.) BNSF does not dispute that their cars are statutorily defined,

7   but argues that the cars are not a "discernible, confined and discrete conveyance . . . from which

8   pollutants are or may be discharged" to water (Dkt. No. 200 at 33) (citing 33 U.S.C. § 1362(14)).

9   Defendant does not challenge discharges that go directly into the water, but contends that

10  "releases to land, and from land to water, are not CWA discharges" because they are not a

11  discrete conveyance of coal directly to water. (Dkt. No. 200 at 28.)  Defendant argues that

12  "[c]oal jostled and scattered by vibration, even if jostled directly into waters, is not sufficiently

13  collected or channeled to constitute a point source." (*Id.* at 34.)

14         It is undisputed that Defendant is the sole transporter of coal adjacent to the waterways at

15  issue. (Dkt. No. 217-1 at 5.) Therefore, there is a discrete source and conveyance for the coal that

16  allegedly lands directly in the water from the trains. However, Plaintiffs have not provided

17  evidence that there is a discrete conveyance of coal into the water for the coal that is deposited

18  onto the land adjacent to the tracks. Plaintiffs allege that the coal enters the water "via wave

19  wash, gravity, fluctuation of water levels, vibration, and the like." (Dkt. No. 267 at 30.)

20  However, Plaintiffs' citation for this assertion is to their complaint, not a scientific study that this

21  kind of phenomenon is possible or happens. Plaintiffs also allege that BNSF data demonstrates

22  that coal can move as far as 30 feet away from the centerline of the tracks in Washington.

23  (Dkt. No. 197 at 28.) However, that is a conclusory statement without demonstration of a

24  discrete conveyance. Although the coal may be deposited by a statutorily defined point source on

25  the ground near the tracks and move from the tracks into the water, it is not clear that the alleged

26  point source, BNSF trains, *caused* the coal to move to the water. Moreover, the word "addition"

in the definition of discharge "means a discharge into navigable waters not an increase in the amount of a pollutant introduced into the system." *Pedersen v. Wash. St. Dep't of Transp.*, 611 P.2d 1293, 1295 (1980). The definition is explicit; the discharge has to be addition of any pollutant *to* navigable water. 33 U.S.C. § 1362(12). Therefore, the Court agrees with Defendant that under these facts, coal discharges to land and from land to water are not point source discharges as defined by the CWA. Defendant is only liable for coal that is discharged directly into the navigable waters at issue if Plaintiffs establish that these kinds of discharges actually occurred.

> b.   *Aerial and windblown emissions*

Defendant also argues that "[a]erial and windblown dispositions from railcars directly into waters" are nonpoint source discharges. (Dkt. No. 200 at 35.) The EPA has published guidelines on nonpoint source pollution and has stated, "[i]n practical terms, nonpoint source pollution does not result from a discharge at a specific, single location (such as a single pipe) but generally results from land runoff, precipitation, *atmospheric deposition*, or percolation." EPA Office of Water, Nonpoint Source Guidance 3 (1987) (emphasis added).[5] Most of the case law on nonpoint source pollution deals with runoff water and stormwater.

However, the Ninth Circuit held that pesticides channeled through a spraying apparatus on a plane, when sprayed *directly over* water, met the statutory definition of a point source discharge. *League of Wilderness Defs/Blue Mts. Biodiversity Project*, 309 F.3d at 1190. In line with this decision, but coming to different conclusions, other district courts and circuit courts have found that airborne pollution is not a point source discharge when the pollution at issue is not discharged via a discernible, confined, and discrete conveyance. *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 224–25 (2d Cir. 2009) (holding that lead dust in berm was not point source discharge because there was no discernible conveyance of the lead dust from the berm to

---

[5] This EPA guidance is available online in PDF form at https://nepis.epa.gov/Exe/ZyPDF.cgi/910217GL.PDF?Dockey=910217GL.PDF.

water); *Alaska Cmty. Action on Toxics v. Aurora Energy Servs.*, LLC, 940 F. Supp. 2d 1005, 1024 (D. Alaska 2013), *rev'd on different grounds*, 765 F.3d 1169 (9th Cir. 2014). In *Alaska Community Action on Toxics*, the district court found that coal dust from stationary coal piles located nearly a half-mile away from navigable waters, 940 F. Supp. 2d at 1009, "no matter how easily [the piles] are identified as the original sources of coal dust blown" into the water, cannot by themselves constitute point source discharges where there was no discernible conveyance. *Id.* at 1024. The Court agrees with this line of decisions: coal dust deposited in the navigable waters from BNSF trains is not a point source discharge unless there is a discrete conveyance.

Here, it is undisputed that "[a]ll [BNSF] coal trains generate coal dust during various periods while in transit." (Dkt. No. 209-7 at 4.) It is also undisputed that BNSFs trains run directly next to and over many of the waterways at issue (Dkt. No. 220-1), and are the only trains to do so in those areas. (Dkt. No. 217-1 at 5.) Therefore, *Alaska Community Action on Toxics*'s holding is not persuasive under this set of facts because the coal particles at issue in that case had to travel nearly a half-mile to get to navigable waters. The facts of this case are closer to *League of Wilderness Defs/Blue Mts. Biodiversity Project*, where pesticides were emitted directly over navigable waters. In this matter, coal particles were allegedly emitted directly over navigable waters. Thus, the Court finds that the coal particles allegedly discharged by BNSF trains that travel adjacent to and above the waters at issue are point source discharges because there is a discrete conveyance: the BNSF trains that travel directly next to or across the water. Defendant is liable for these aerial point source discharges if Plaintiffs establish that these kinds of discharges actually occurred.

### 2. CWA Violation Evidence

Finally, after clarifying which of Defendant's emissions are in fact point source discharges, the Court moves to consider whether either party's motion for summary judgment can be granted. Plaintiffs base their entire theory of liability for over 12 million CWA violations on the proposition that "[e]ach and every train and each and every rail car discharges coal

ORDER DENYING PLAINTIFFS' AND
DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT
PAGE - 18

1   pollutants to waters of the United States when traveling adjacent to, over, and in proximity to the

2   waters of the United States." (Dkt. No. 113 at ¶ 48.) Therefore, the Court must find there is no

3   genuine dispute of material fact that the evidence supports or does not support this proposition to

4   grant Plaintiffs' or Defendant's motions for summary judgment, respectively. If Plaintiffs can

5   support this imposing allegation, they have proven that actual discharges occurred on specific

6   days, as they are required to do by statute. *See* 33 U.S.C. § 1319(d) ("Any person who violates

7   section 1311 . . . of this title . . . shall be subject to a civil penalty not to exceed $25,000 *per day*

8   *for each violation*") (emphasis added); *Alaska Cmty. Action on Toxics*, 940 F. Supp. 2d at 1027

9   (emphasizing that plaintiffs had to prove "actual discharges . . . on specific days"). However, as

10  stated above, Defendant is only potentially liable for point source discharges of coal that went

11  directly into the water and point source discharges of coal dust that came from trains passing

12  directly above or adjacent to the waters.

13          Plaintiffs have offered studies completed and data collected by Defendant to prove their

14  sweeping allegation. These studies include studies using "passive" coal collectors to collect coal

15  blown off the tops of cars (Dkt. No. 214-4), studies using "coal traps" to quantify the "coal/coal

16  dust problem" (Dkt. No. 214-3), and studies estimating a loss from the top of coal cars to be

17  "50-500 lbs/car/100miles" and a loss from the bottom of coal cars to be "10 lbs/100miles"

18  (Dkt. No. 216-1 at 5), among many others. Plaintiffs also provided many expert reports, witness

19  observations of coal found in the environment and being released from BNSF trains (*see, e.g.*,

20  Dkt. No. 199 at ¶ 9), analysis of coal collections at various waterways (Dkt. No. 210-1), and two

21  studies from the Columbia River (Dkt. No. 208 and exhibits; Dkt. No. 221-1) to prove that BNSF

22  trains emit coal pollutants into water each time they travel close to the Washington waters at

23  issue. Plaintiffs argue that this large amount of data demonstrates that there is no dispute of

24  material fact that Defendant is liable for CWA violations. Defendant counters that Plaintiffs

25  misconstrue BNSF's data and studies (Dkt. No. 272 at 18), the parties' experts disagree (*id.* at

26  14), Plaintiffs' witnesses are insufficient to prove violations (*id.* at 26–32), and the Columbia

1  River float study is insufficient evidence of point source discharges of this magnitude (*id.* at 33–

2  36).

3      Immediate review of these arguments reveals that there are inherent disputes of material

4  fact, most significantly Defendant's concession that the experts disagree. Moreover, upon review

5  of the evidence, the Court finds that Plaintiffs' central theory driving this case, that "[e]ach and

6  every train and each and every rail car discharges coal pollutants to waters of the United States

7  when traveling adjacent to, over, and in proximity to the waters of the United States" (Dkt. No.

8  113 at ¶ 48), remains in dispute. Both parties have provided an extensive amount of evidence to

9  support their arguments and both parties come to different conclusions about the implications of

10  the evidence. A reasonable trier of fact, upon drawing reasonable inferences from the extensive

11  evidence, could determine that Plaintiffs' evidence was sufficient to support a conclusion that

12  Plaintiffs' allegation is more likely than not true. However, a reasonable trier of fact could also

13  determine that Plaintiffs have not met their burden of proving that a CWA violation occurred

14  every single time BNSF trains passed based on the preponderance of evidence standard and the

15  same evidence. Therefore, "there is sufficient evidence for a reasonable jury to return a verdict

16  for [either] non-moving party." *Anderson*, 477 U.S. at 248–49. In order to decide which theory is

17  correct, the Court would be required to weigh evidence, for example the BNSF studies that

18  Defendant's claim are being misinterpreted, which is impermissible at the motion for summary

19  judgment stage. *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (citing *Anderson*, 477 U.S. at 249).

20  Therefore, the Court denies the parties' motions for summary judgment.

21      The Court has outlined above what point source discharges will be sufficient for

22  violations of the CWA at trial. The Court declines to find Defendant liable of any violations at

23  this time due to the disputes of material fact that remain.

24  **D.      Interstate Commerce Commission Termination Act Preemption**

25      When Congress passed the ICCTA, it vested jurisdiction to regulate rail transportation in

26  the Surface Transportation Board, a federal agency. 49 U.S.C. § 10501(b). This jurisdiction

1  includes "transportation by rail carriers, and the remedies provided in this part with respect to

2  rates, classifications, rules (including car service, interchange, and other operating rules),

3  practices, routes, services, and facilities of such carriers." *Id.* The ICCTA further states that "the

4  remedies provided under this part with respect to regulation of rail transportation are exclusive

5  and preempt the remedies provided under Federal or State law." *Id.* However, "[i]f an apparent

6  conflict exists between ICCTA and a federal law, then the courts must strive to harmonize the

7  two laws, giving effect to both laws if possible." *Ass'n of Am. Railroads v. S. Coast Air Quality*

8  *Mgmt. Dist.*, 622 F.3d 1094, 1097 (9th Cir. 2010).

9      Defendant argues that Plaintiffs' requested injunctive relief is preempted by the ICCTA

10  (Dkt. No. 200 at 43–57), and Plaintiffs disagree (Dkt. No. 197 and 45–46). However, the Court

11  has declined to find Defendant liable for CWA violations at this time. Therefore, the Court

12  postpones its decision on the ICCTA preemption issue until after a possible finding of liability at

13  trial.

14  **III.    CONCLUSION**

15      For the foregoing reasons, Plaintiffs' motion for partial summary judgment (Dkt. No.

16  197) is DENIED and Defendant's motion for summary judgment (Dkt. No. 200) is DENIED.

17      DATED this 25th day of October 2016.

18

19

20

21

22

23      _____

24      John C. Coughenour
        UNITED STATES DISTRICT JUDGE

25

26

ORDER DENYING PLAINTIFFS' AND
DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT
PAGE - 21