THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SIERRA CLUB, *et al.* | CASE NO. C13-0967-JCC |
| Plaintiffs, | ORDER |
| v. | |
| BNSF RAILWAY COMPANY, | |
| Defendant. | |

This matter comes before the Court on the parties' joint motion requesting dispute resolution and stipulated motion to seal (Dkt. No. 419). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion in Plaintiffs' favor for the reasons explained herein.

## I. BACKGROUND

The litigation out of which this dispute arises began in 2013. Plaintiffs, several environmental interest groups, filed suit alleging that Defendant BNSF Railway Company violated the Clean Water Act by polluting various waterways with dust from its open-top coal cars. (Dkt. No. 1.) The parties settled that lawsuit pursuant to a Consent Decree (the "Decree") entered on May 2, 2017. (Dkt. No. 384.) The Decree imposed three primary obligations on Defendant. First, Defendant was required to clean up accumulated coal and petcoke material at several locations along its tracks. (*Id.* at ¶¶ 15–20.) Second, Defendant was required to donate

$1,000,000 to an environmental non-profit organization. (*Id.* at ¶ 21.) Third, Defendant was obligated to conduct a study of the commercial and operational feasibility of covers for its open-top coal cars to reduce the coal dust blown from moving trains. (*Id.* at ¶¶ 8–14.) The dispute before the Court centers on the "Car Cover Study" requirement. (Dkt. Nos. 419–21.)

### A. The Car Cover Study Requirement

The Decree required Defendant to "conduct a study to assess the commercial and operational feasibility of car covers for use on open-top coal and petcoke railcars." (Dkt. No. 384 at ¶ 8.) Defendant was obligated to evaluate only those car covers "for which a functioning prototype [was] reasonably available to [Defendant] within six months" of the entry of the Decree. (*Id.*) In the "first phase" of the study, Defendant was required to "conduct outreach and solicit participation from car cover manufacturers." (*Id*. at ¶ 9.) The Decree did not require Defendant to "develop any car cover design" or assess "conceptual" car cover designs. (*Id*.) Defendant was, however, "exclusively responsible for conducting and overseeing the Car Cover Study, as well as arranging for equipment and personnel." (*Id.*)

Once the Car Cover Study was underway, the Decree required Defendant to provide twice-yearly reports to Plaintiffs regarding the study's progress. (*Id.* at ¶ 11.) If through the study Defendant determined that a car cover was commercially and operationally "feasible," the Decree required it to adopt the technology and present it to other members of the railroad industry. (*Id.* at ¶¶ 12, 14.) The Decree defines "feasible" to mean those designs compatible with Defendant's current coal-transportation operations. (*Id*. at ¶ 13.)

### B. Defendant's Outreach Efforts in the "First Phase" of the Study

After the Decree was entered on May 2, 2017, Defendant "convened an internal working group responsible for the Study, that began planning the Study logistics," and "began to identify parties" who might be able to provide prototypes. (Dkt. No. 421 at 3.) On September 15, 2017—more than four months after the Decree was entered—Defendant emailed manufacturers requesting proposals. (*Id*.) The request summarized the terms of the Decree and informed

recipients that the study "would be limited to functioning prototypes that are available for use . . . no later than November 2, 2017." (Dkt. No. 423 at 6.)

Several manufacturers expressed interest in participating. One of those manufacturers (the "Manufacturer"), had already been in contact with Defendant regarding a prototype car cover before the Decree was entered. (Dkt. No. 420-1 at 29–32.) As early as November 2016, a representative from Manufacturer was in contact with Defendant regarding its prototype car cover. (*Id.* at 31–32.) Around that time, Defendant sent Manufacturer a list of 17 detailed "design considerations" for a car cover design. (*Id.* at 29–30.) In response to Defendant's September 2017 request for proposals, Manufacturer sent Defendant a detailed proposal and schematics of its prototype. (*Id*. at 22.) Manufacturer told Defendant that it was "all ready to start on the coal cover, so we can build the test unit for the car." (*Id*.) Manufacturer quoted the price for one cover to include "design, construction, and installation cost" and promised that it would work to "have a cover by the end of the year to install for your testing." (Dkt. No. 423 at 41.) The record indicates that Defendant did not respond to Manufacturer's official proposal before the November 2, 2017 deadline. (Dkt. Nos. 420-9 at 2, 421 at 4.)

In January 2018—more than two months after the Decree's deadline for procuring a prototype cover—Defendant emailed Manufacturer and several other suppliers re-soliciting proposals. (*See* Dkt. No. 420-1 at 35.) Defendant reiterated that the Decree "only required [it] to assess car cover designs with a functioning prototype that is reasonably available . . . by November 2, 2017," which had already passed. (*Id.*) "Based on our correspondence and discussions," Defendant stated, it "underst[ood] that your company d[id] not currently have a functioning prototype" for use in the Car Cover Study. (*Id.*) Notwithstanding that deadline, Defendant inquired whether Manufacturer and the other suppliers would be able to field a prototype at a later date. (*Id.*) A little more than two weeks later, Manufacturer sent Defendant an updated proposal. (*Id.* at 16.) Manufacturer promised delivery and installation by July 2018, and offered Defendant the opportunity to lease a prototype instead of buying one. (*Id.*) Defendant

continued a regular dialogue with Manufacturer after that time, but never committed to testing its prototype cover. (*See* Dkt. No. 420 at 4–5.)[1]

### C. Plaintiffs Invoked the Decree's Dispute Resolution Provisions

In late April 2018, Defendant informed Plaintiffs that it had not begun the Car Cover Study because a functional prototype was not available by November 2, 2017. (*See* Dkt. No. 420-5 at 2–3.) Plaintiffs replied to Defendant in May 2018 and invoked the Decree's dispute resolution provisions. (Dkt. No. 420-7.) The parties exchanged documents regarding Defendant's efforts to secure a prototype, but the parties failed to reach a satisfactory resolution. (Dkt. No. 420 at 4.) The parties jointly move the Court to resolve the dispute. (Dkt. No. 419.) Plaintiffs request the Court "order [Defendant] to commence the study as soon as practicable." (Dkt. Nos. 419, 420 at 7.) Defendant asks the Court to find it has no further obligation regarding the Car Cover Study. (Dkt. No. 421 at 6.)

## II. DISCUSSION

### A. The Court's Authority to Enforce the Decree

A trial court retains jurisdiction to enforce its consent decree. *Hook v. State of Arizona, Dep't of Corr.*, 972 F.2d 1012, 1014 (9th Cir. 1992). The Decree in this case expressly grants jurisdiction to the Court to issue orders as needed for the Decree's "implementation or modification," or for "enforcing compliance with, or resolving disputes regarding" it. (Dkt. No. 384 at ¶ 2.) Thus, the Court has jurisdiction to resolve this dispute, to modify the Decree, or to order a party to comply with it.

Courts interpret consent decrees as contracts, applying state contract law. *Jeff D. v. Otter*, 643 F.3d 278, 284 (9th Cir. 2011); *United States v. Asarco, Inc.*, 430 F.3d 972, 980 (9th Cir. 2005). Under Washington law, "[t]here is in every contract an implied duty of good faith and fair

---

[1] Defendant heard from several other interested suppliers who might have been able to field a prototype. (*See* Dkt. No. 420 at 4–6.) As with Manufacturer, the record indicates that Defendant took no action to secure a prototype from those manufacturers before the November 2, 2017 deadline, and that it re-solicited prototypes after the deadline had passed. (*Id.*)

dealing [that] obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991). The implied duty of good faith "requires 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Edmonson v. Popchoi*, 256 P.3d 1223, 1227 (Wash. 2011) (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)).

Because consent decrees are both a contract and a judicial order, courts have the "inherent authority" to modify their terms when enforcement is "no longer equitable." *Washington v. Moniz*, Case No. 2:09-CV-5085-RMP, 2015 WL 12643792, slip op. at 7 (E.D. Wash. 2015). A modification is appropriate when there is a "significant change either in factual conditions or in the law." *Asarco*, 430 F.3d at 979 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). Courts will not ordinarily modify a consent decree where the relevant changed circumstances "actually were anticipated at the time" the decree was entered. *Id*.

A party's failure of "substantial compliance" with the requirements of a consent decree may constitute a change in factual conditions to justify modifying a decree, including extending a decree's time limits. *See Labor/Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transit Auth.*, 564 F.3d 1115, 1120–21 (9th Cir. 2009). "Substantial compliance" is met where a deviation from the decree's terms is "so minor and trivial as not 'substantially to defeat the object which the parties intend to accomplish.'" *Jeff D.*, 643 F.3d at 284 (quoting *Wells Benz, Inc. v. United States*, 333 F.2d 89, 92 (9th Cir. 1964)). If modification is warranted, a court must then determine if the appropriate modification is one "suitably tailored to resolve the problems created by the changed" circumstances. *Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1120–21 (citing *Rufo*, 502 U.S. at 391).

**B.     Defendant's Compliance with the Car Cover Study Requirement**

The Court finds that Defendant's initial delay in attempting to procure a functional car cover prototype was a breach of the Car Cover Study requirement. (*See* Dkt. No. 384 at ¶ 9.) Although Defendant states that it "convened an internal working group" and "began to identify"

potential suppliers after the Decree was entered on May 2, 2017, it fails to explain its substantial delay in soliciting proposals from those suppliers. (Dkt. No. 421 at 2.) Defendant did not send its request for proposals until four months after the Decree was entered—or 48 days before the Decree's deadline for it to procure a "reasonably available" prototype. (*See* Dkt. Nos. 420-1 at 2–3, 384.) Defendant's inaction is even less justified when considering that it had been in contact with Manufacturer long before the Decree was entered. (Dkt. No. 420-1 at 29–32.) Defendant was obligated to solicit manufacturers in the "first phase" of the Car Cover Study, not simply identify them. (Dkt. No. 384 at ¶ 9.) Defendant was aware that Manufacturer was interested in providing a prototype, and only needed to formally request one. Its unaccounted-for delay in soliciting manufacturers reduced the likelihood that Defendant would find a prototype available before the November 2, 2017 deadline—the critical "first phase" of the Car Cover Study. (*Id.*)

Defendant's delay was a failure of substantial compliance with the terms of the Decree because it undermined the purpose of the Car Cover Study requirement, which was to identify prototype covers that might eventually be used on Defendant's trains. *See Jeff D.*, 643 F.3d at 284. Defendant's delay was also a breach of its implied duty of good faith to complete the Car Cover Study because it reduced the probability that Defendant would procure a functioning prototype by November 2, 2017. *See Edmonson*, 256 P.3d at 1227. Defendant has not offered a sufficient justification for that delay, and the Court finds that Defendant breached its obligations under the Decree.

### C. Availability of Car Cover Prototypes

Defendant asserts that "even if [it] had begun outreach immediately upon entry of the Decree, the evidence demonstrates that [it] still would not have found an available prototype" by the deadline. (Dkt. No. 421 at 5.) Defendant essentially argues that even if its delay was unwarranted, it was harmless. The Court disagrees.

As early as January 2017, Defendant was in contact with Manufacturer regarding a cover for open-top train cars. (Dkt. No. 420-1 at 29–32.) Near that time, Defendant sent Manufacturer a

list of 17 "design considerations" for such a cover. (*Id.*) Then, after Defendant's mid-September 2017 official request for proposals, Manufacturer offered to build and install a functioning prototype by the end of the year. (Dkt. No. 423 at 40–41.) Assuming that Manufacturer could deliver on that promise—which Defendant does not appear to dispute—the record demonstrates that Defendant could have had a functional prototype a little more than three months after soliciting one. Had Defendant made that request when the Decree was entered, or within a reasonable time thereafter, it could have taken delivery before the six-month deadline. In other words, while Manufacturer's projected delivery date did fall after the Decree's November 2, 2017 deadline, that appears to be the result of Defendant's delay in soliciting proposals.

Defendant also emphasizes that Manufacturer's October 2017 proposal listed the price for its prototype to include "design, construction, and installation cost." (Dkt. No. 420-1 at 24.) Defendant claims that Manufacturer's proposal would have "contravened the [Decree], which expressly provides . . . that it 'shall not be construed to require [Defendant] to . . . develop any car cover design.'" (Dkt. No. 421 at 4.) But the Decree also provides that, "As between the Parties, [Defendant] is *exclusively* responsible for … arranging for equipment and personnel." (Dkt. No. 384 at ¶ 10) (emphasis added). Given that provision, the Decree makes Defendant responsible for the reasonable costs of procuring a functional prototype for the study. (*Id.*) Nevertheless, Defendant argues that it was not required to accept Manufacturer's proposal because it would have been required to pay Manufacturer to design a car cover. For two reasons, Defendant's position is unavailing.

First, nothing in the Decree shields Defendant from having to incur some expense to field prototypes to be used in the Car Cover Study. As noted above, the Decree makes any cost incurred in the study Defendant's to bear. Nor does the Decree shield Defendant from the obligation to fund the design process. The operative language in the Decree provides only that Defendant is not required to "*develop* any car cover design." (*Id.*) (emphasis added). The Decree says nothing about Defendant's obligation to pay a supplier to do so.

Second, even if the Court interprets the Decree to mean that Defendant would not be obligated to fund the design of a car cover, Manufacturer's prototype proposal did not ask it to. Although the proposal stated that it covered "design, construction, and installation cost," it is clear that Manufacturer had already designed the cover. (Dkt. No. 420-1 at 24.) Defendant casts Manufacturer's proposal as an offer to design a cover out of whole cloth. (*See* Dkt. No. 421 at 4.) But not only did Manufacturer's proposal describe the prototype's functionality—implying that it had already been designed—it included detailed schematics. (Dkt. No. 420-1 at 23–26.) Also, consistent with the fact that Defendant and Manufacturer had begun discussing the design of a car cover months earlier, Manufacturer's initial proposal endeavored to have a cover ready for installation within less than three months. (*Id.*) Far from asking that Defendant pay to design a car cover prototype, the Court finds that Manufacturer's proposal merely requested that Defendant make a financial commitment to secure a prototype for use in the study—the very obligation Defendant has under the Decree.

### D. Modification of the Car Cover Study Requirement

The Court construes Plaintiffs' requested relief as a petition to modify the terms of the Decree. Plaintiffs' request that the Court "order [Defendant] to commence the study as soon as reasonably practicable" requires a modification because Defendant was only obligated to do so with prototypes "reasonably available" to it by November 2, 2017. (Dkt. Nos. 420 at 3, 384 at ¶ 9.) Defendant points out that the Decree requires the parties to "make a good faith effort to reach agreement" before moving the Court for modification. (Dkt. 421 at 5.) Defendant argues that Plaintiffs have failed to comply with that requirement. (*Id.*) The parties did, however, confer at length about Defendant's obligation regarding the Car Cover Study before moving the Court for dispute resolution. (*Id.* at 2) ("The Parties extended the Decree's 30-day period for informal dispute resolution. . ."). The Court finds that the informal dispute resolution period satisfies the

requirement that the parties confer before moving the Court to modify the Decree.[2] (Dkt. No. 384 at ¶¶ 40–42.)

As noted above, the Court finds that Defendant's four-month delay in soliciting functional car cover prototypes constitutes a failure of substantial compliance with the Decree's terms that warrants modifying the Decree. *Asarco*, 430 F.3d at 979; *see also Labor/Cmty. Strategy Ctr.*, 564 F.3d at 1120–21. An appropriate modification must be "suitably tailored to resolve the problems created" by that delay—here, that Defendant could not secure a "reasonably available" prototype by the six-month deadline. *Asarco*, 430 F.3d at 979; (Dkt. No. 384 at ¶ 9.) Therefore, the Court finds that an appropriate remedy is a fresh six-month period during which Defendant must actively solicit functional prototype car covers. This modification seems especially appropriate because the record indicates that one or more manufacturers is most likely capable of supplying a prototype within that timeframe.

### E. The Parties' Joint Motion to Seal

The parties also filed a stipulated motion to seal their respective dispute resolution statements as well as attached affidavits and exhibits. (Dkt. No. 419 at 2.) The Court starts from the position that "[t]here is a strong presumption of public access to [its] files." W.D. Wash. Local Civ. R. 5(g). But where the records sought to be kept under seal accompany a non-dispositive motion, the Court need only find "good cause" to permit sealing. *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006). The Court has reviewed the documents the parties move to seal. Many contain information from non-party car cover manufacturers regarding prototype car covers, and include detailed designs, manufacturing methodologies, and pricing information. (*See generally* Dkt Nos. 420–23.) Moreover, the parties' dispute resolution statements contain detailed references to these documents. (*See* Dkt. Nos. 420, 421.) The Court finds that such information, if made public, could inflict competitive harm on

---

[2] Even if the Court did not regard this motion as a proper petition for modification, the Court has the inherent authority to modify the Decree's terms. *See Moniz*, 2015 WL 12643792 slip op. at 7.

those non-parties, and that good cause exists to maintain the records under seal. The parties' stipulated motion to seal Docket Numbers 420–23 and accompanying attachments is therefore GRANTED.

## III. CONCLUSION

For the foregoing reasons, the parties' joint motion requesting dispute resolution (Dkt. No. 419) is GRANTED in favor of Plaintiffs. It is hereby ORDERED:

For purposes of completing the Car Cover Study, Defendant shall assess car cover designs for which a functioning prototype is reasonably available to BNSF within six months from the date of this order. Defendant shall forthwith conduct outreach and solicit participation from car cover manufacturers in order to secure a functioning prototype for the car cover study. Defendant shall file a status report every 45 days, until the end of the six-month period, updating the Court on its progress in procuring a functioning car cover prototype. Defendant remains obligated to complete all other requirements of Car Cover Study.

The Clerk shall maintain docket numbers 420–423, and the exhibits attached to each, under seal.

DATED this 11th day of October 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE